Liggat v. Hart.

ALEXANDER LIGGAT, Defendant in Error, v. OLIVER A. HART, Plaintiff in Error.

1. Under the revised codes of 1835 and 1845, (R. C. 1835, tit. Wills, sec. 1, p. 617, R. C. 1845, p. 1078,) as under the act of July 4th, 1807, (1 Terr. Laws, ch. 39, sec. 18, 19, p. 132,) real property acquired after the date of a will would pass to the devisee, where such appeared to be the intention of the testator.
2. Where a will, after the making of several specific bequests, proceeded as follows: "I hereby direct, authorize and wish my executors to sell the whole of my real, personal and mixed property, on a credit of twelve months, the proceeds of which, together with what cash I may die possessed of, after all my just debts have been paid, and the sum of one hundred dollars to such of my legitimate nephews as at my death may be found named James, ($100 each,) I wish disposed of in the following manner, viz : to be sent by my executors to Ireland," &c., to be invested for the benefit of the testator's brothers and sisters, &c. ; *held,* that it sufficiently appeared upon the face of the will that it was intended to cover, and provide for the sale of, all the real property owned by the testator at the time of his death.

*Error to St. Louis Land Court.*

The following agreed case was submitted to the Land Court under article 20 of the practice act of 1849 (Sess. Acts, 1849, p. 95):

" On the 7th of July, 1851, Patrick McLaughlin, being seized in fee, conveyed to James Boal, and his heirs, the undivided third part of a lot of ground in block No. 99, in the city of St. Louis, having a front of 47 feet, more or less, on Locust street, and a depth of 57½ feet running southwardly ; bounded north by Locust street, east by a lot of one Martin, south by a lot of John Eyrne, and west by a lot of Baptist Godoir. Prior to this conveyance, said Boal had no interest in said land. James Boal died in the year 1851. In the year 1835, he had made and published his last and only will and testament, a copy whereof is as follows :

" ' In the name of Israel's God, Amen. I, James Boal, of the town of Lynchburg, and state of Virginia, do make this, my last will and testament, revoking all others. First, I re-

turn to my brother John Boal, the gold watch which he presented me some time ago ; secondly, I give and bequeath to my uncle, Alexander Liggat, and his heirs forever, my lot of ground in the Presbyterian graveyard, near Lynchburg ; thirdly, I hereby direct, authorize and wish my executors to sell the whole of my real, personal and mixed property, on a credit of twelve months, the proceeds of which, together with what cash I may die possessed of, after all my just debts have been paid, and the sum of $100 to such of my legitimate nephews as at my death may be found named James, ($100 each,) I wish disposed of in the following manner, viz : to be sent by my executors to Ireland, and placed in the hands of two or three such persons as my brothers and sisters may select as trustees ; said trustees to pay out of the said fund to each of my brothers and sisters, annually, the sum of ten pounds sterling, as long as they shall live. The balance to be loaned out by said trustees, taking bond, with good security, and payable to themselves and successors, subject to the payment annually of the interest and the above named dividend of ten pounds sterling to each of my brothers and sisters ; and in case of the death of either of the above named brothers and sisters, the dividend of such is to stop and to be kept in the principal fund. And when all my brothers and sisters shall have died, and it appears that there is still a balance, it is my wish and desire that said balance, principal as well as interest, be equally divided among my legitimate nephews and nieces, including also such as are named James. I hereby appoint Alexander Liggat and Patrick Matthews to execute this, my last will and testament ; and, in the event of their death, such other two of my friends as the corporation court of Lynchburg may select, provided such will act without receiving any further compensation or commission than the expenses incurred by them in the performance of that friendship. Witness my hand and seal at Lynchburg, this 23d day of December, in the year 1835, in the 36th year of my age, and of my residence in America the eighteenth.

JAMES BOAL, (seal.)'

" There were two subscribing witnesses to this will, and it was duly admitted to probate in St. Louis county, on the 4th November, 1854.

" The deceased, James Boal, had never been married. His next of kin and nearest blood relation of all who were resident in the United States was Alexander Liggat. He had brothers and sisters in Ireland, together with their children, but these were and always had been non-resident aliens. Alexander Liggat was his uncle.

" On the 21st day of June, 1855, Alexander Liggat made with Oliver A. Hart a contract in writing for the sale of the said undivided third part of the lot of ground above described for the sum of $1525 00, whereof one-fourth was to be paid in cash, and the balance in three equal annual instalments, bearing interest from the day of the sale, and secured by a deed of trust on the property sold. The plaintiff, Alexander Liggat, tendered a deed in due time to the defendant, Oliver A. Hart, and demanded payment of the purchase money, the deed and the demand being according to the contract aforesaid. Defendant refused to pay the money or give security or receive the deed, on the ground that the title of the plaintiff was not marketable—that is, not valid. The title is valid, if the plaintiff takes the interest of James Boal as heir at law. If the court shall be of opinion that the title of the plaintiff is not marketable, then a judgment shall be rendered for the defendant. If the court shall be of opinion that the title of the plaintiff is marketable, a decree shall be rendered for the specific performance of the contract of sale made between plaintiff and defendant on the 21st June, 1853, either party may appeal or sue out a writ of error."

Upon this case, the court gave judgment for the specific performance of the contract, deciding, 1. That James Boal died intestate as to the land in question, which was acquired after the making and publication of his will. It is unnecessary to inquire whether the devise, so far as it operated at all, was of realty or personalty, or whether non-resident aliens can take

and hold real estate, by will, until inquest of office found. 2. That the only heir of James Boal, capable of taking the land by descent, is the plaintiff, and that he has all the title thereto which James Boal had at the time of his decease. 3. That as the agreed case admits the title to be valid, if plaintiff takes the interest of James Boal, the plaintiff is entitled to a specific performance of the contract of sale, mentioned in the case made, and a decree should be entered accordingly.

The defendant, Hart, took all proper exceptions, and moved for a review of the case and judgment for the defendant ; which being overruled, he brings the case here by writ of error.

· *Glover & Richardson*, for plaintiff in error.

I. By our laws, in December, 1835, when the will of James Boal was made, a testator might, if he used apt words for that purpose, devise lands which he should acquire after making his will. It was the statute 32 Henry VIII, ch. 1, which authorized the disposition of lands by last will. ( 2 British Stats. at large, 272 ; 8 Bacon's Abr. 441. ) The English courts placed on the language of this statute a severe construction (Plowden, 544 ; 2 Ves. jr. 427), and it became a settled rule of decision that a testator could not, under this statute, under any circumstances, devise all his real estate, but that so much only would pass by his will as he happened to have or own at the making of it. This doctrine was very inconvenient, and has given way to legislation in England, and also, to a great extent, in this country. ( Geyer's Dig. 430 ; R. C. 1825, p. 790 ; Smith v. Eddington, 8 Cranch, 66 ; Harrison v. Allen, 3 Call, 296 ; 4 Scam. 67 ; 2 Indiana Rev. Stats. 308 ; Maine Rev. Stats., 1840, p. 376 ; 4 Kent, 512. ) A testator clearly might, under the acts of 1815 and 1825, dispose by will of after acquired lands. The revised code of 1835 did not abridge the power of devising given by the acts of 1815 and 1825.

II. The will of James Boal is sufficient in the language it employs, to pass the after acquired lands, supposing the devisees competent to take, they being aliens.

III. Inasmuch as the will directs the lands to be sold and

the proceeds to be disposed of, the lands must be regarded as money, and there is no legal objection to the devise taking effect, notwithstanding the alienage. As to this point, see the following authorities : 2 Story's Eq. 100 ; 2 Kent, 62, 63 ; 14 Mo. 528 ; 3 Wheat. 503 ; 6 Paige, 448.

*T. T. Gantt*, for defendant in error.

I. The first point decided by the court below was correctly decided. After the first day of December, 1835, when the act of that year concerning wills went into effect, a testator could not make a will to operate upon land in Missouri acquired after the date of the publication of his will. The act of 1845, on the subject of wills, was almost, word for word, the same with that of 1835. The words of the statutes of 1815 and 1825 (see 1 Terr. Laws, p. 405, § 25 ; R. C. 1825), and still more, those of the act of July 4th, 1807, (1 Terr. Laws, p. 131, § 18,) were, however *strikingly different* from those of the act of 1835. Granting that by these several acts of 1807, 1815, and 1825, a devisor might dispose of after acquired lands, it is evident that our statute of wills, adopted in 1835, and re-adopted in 1845, was, in respect to the power of disposition, a return to the English statute of wills, of 32 Henry VIII, ch. 1. Our statute is, not in terms but in meaning, the same as the English statute. The words " persons having moneys, lands," &c., of the English statute, were supposed by the judges, in the case of Butler v. Baker, (3 Co. Rep. 30,) to be a basis for that quaint, verbal criticism, to which the learned of that day were so much addicted. But, in Cowper's Reports, p. 90, it was declared that it was not to this phraseology that the uniform construction of the English statute was due, but to the plain, obvious import of the words employed. In our own country, upon statutes similar to the English statute, and upon the English statute itself, there have been repeated decisions establishing the legal doctrine that after acquired lands do not pass by a will. (See 1 Salkeld, 237 ; 1 Saund. 277, note 4 ; Archer v. Bokenham, 11 Mod. 148 ; Harwood v. Goodright, Cow. 90–1 ; Hogan v. Jackson, ib. 305 ; Langford v. Pitt, 2

P. Williams, 629; Hogan v. Jackson, 6 Mass. 149; Bollard v. Carter, 5 Pick. 112; Rogers v. Potter, 9 Johns. 312; McKinnon v. Thompson, 3 John. Ch. 307; Livingston v. Newkirk, id. 312; Kendall v. Kendall, 5 Munf. 272; Burke v. Young, 2 Serg. & R. 388-9; Kemp v. McPherson, 7 Har. & Johns. 320, 335.) Even where statutes, much more unambiguous than ours was in 1825, are in force, as in Virginia, the clearest manifestation of an intention that a will shall operate on after acquired lands, is declared to be necessary, in order that it shall have that operation. (See Smith v. Eddrington, 8 Cranch, 66; Harrison v. Allen, 3 Call, 389; also Philadelphia v. Davis, 4 Raw. 490; Burke v. Young, 2 S. & R. 388.)

II. The second point decided by the court was correctly decided. The only heir at law of James Boal, capable of taking the land by descent, was the plaintiff, Alexander Liggat. (1 Thomas' Coke, 90–91; 3 Cruise's Dig. 365-6; 2 Kent Com. 60–1.) There is nothing in our statute respecting aliens, (R. C. 1845, p. 113, which is a transcript of the law of 1835,) or in our statute of descents and distributions, changing the rule of the common law in this respect.

III. The third point decided by the court, being a corollary from the first two propositions, is correct.

LEONARD, Judge, delivered the opinion of the court.

Mr. Butler, in a very able note to Coke's First Institutes, (191, *a*,) after specifically pointing out the difference between the Roman and the feudal law, upon the subject of succession to the estates of deceased persons, thus forcibly sums up the the contrast: "By the Roman law, the heir was a person appointed indiscriminately *by the law or the deceased to represent him*, and, in consequence of that representation, was entitled to his property, and bound by his obligations. In the feudal law, the heir was a person of the blood of the ancestor, appointed by the original contract to the succession, and, in consequence of that succession, was supposed, more by the general

notions of mankind than by the notions of the feudal polity, to represent the ancestor.  By the Roman law, the heir succeeded to the property of the ancestor in consequence of this civil representation of him, and supposed continuation of his personal estate.  In the feudal law, he acquired a national representation to the ancestor, in consequence of the feudal succession.  In the Roman law, real and personal property was equally the subject of inheritance.  In the feudal law, inheritance was confined to real property.  The Roman heir claims as such all from the person last possessed, and nothing from the original donor.  The feudal heir claims as such all from the donor, and nothing from the person last possessed."  The power of an owner to appoint a successor to his property, both real and personal, after his death, which seems to be nothing more than one of the natural rights of property, prevailed to its full extent among the Saxons of England.  When, however, upon the establishment of the Normans, the feudal system became part of the law of England, so that tenants in fee could not alien without the consent of the lord, the power of disposing by will, as well as every other mode of aliening land, generally ceased.  And, although the feudal restraint upon alienation could not but gradually yield, as an unnatural limitation upon property, and accordingly many of the restraints were removed before Glanville wrote, yet the power of disposing by will was not allowed for a long time afterwards, partly from the fear lest persons should be imposed upon in their last extremity, and partly for the want of that notoriety which the common law required in all transfers of real property.  During the suspension of the direct power, which continued from Henry II to the latter end of the reign of Henry VIII, it was indirectly but substantially acquired, and exercised by means of uses.  This indirect practice, however, of devising lands, was at length checked by the statute of the 27th Henry VIII, which, transferring the legal estate to the use, extinguished, for a time, the separate equitable ownership, and with it the incidental power of devising.  The consequence was, that lands

again became generally unalienable, except by a conveyance, to take effect in the lifetime of the proprietor; but the legislature found it necessary, within a few years afterwards, to allow of testamentary dispositions of land, and for that purpose the statute of wills was passed in 31 Henry VIII, and amended in the 34 of the same king (1 Powell on Devises, ch. 1; Cruise on Real Property, tit. 38, ch. 1).

While the power of disposing of lands by will was exercised by means of uses, the will being considered the mere appointment of a use, it was holden that it could only operate on lands of which the party was possessed at the time, and could not affect any lands subsequently acquired; and the courts accordingly adopted the same narrow principle when they came to put a construction on the statute of wills; and, therefore, although the idea of a real devise was, as Lord Mansfield remarked, (Cowper, 303,) derived from a Roman will, which was the appointment of an heir to succeed to the property and to discharge the obligations of the ancestor, including his testamentary donations, yet it was treated in the English law not like an English will of personal property, when the executor corresponds with the instituted heir of the Roman law, but as a particular conveyance of the lands embraced in it, and was subjected, in the particular now under consideration, to the rules applicable to such conveyances, instead of being treated as a testamentary disposition to take effect after the death of the disposer. It accordingly became a settled rule in the construction of the English statute of wills, that, if a testator devised all the real estate of which he should be seized at the time of his death, and after the making of the will he purchased lands in fee, such after acquired property, whether it was conveyed to the testator or to a trustee for him, did not pass by the will, but descended, as to the legal inheritance in the former case, and as to the equitable in the latter, to the testator's heirs at law (1 Jarman on Wills, 85; Booker v. Cooke, 1 Salk. 237; S. C., 3 Bro. P. Cases); and the reason of this was, not on account of the intent on the part of the testator, but

because he had no legal power to dispose by will of land which he did not own at the time; and the reason given for this construction was not merely that a limited testamentary power was conferred by the very words of the act, but because such was the legal consequence, in the absence of any express provision to the contrary, of considering a devise, not in the nature of a will, but of a particular conveyance. Under the old law, therefore, when a testator made a general gift of his real and personal estate, he was considered as meaning to dispose of these respective portions of property to the full extent of his testamentary power, and it accordingly took effect as a gift of such real estate as belonged to him at the time of the execution of the will, and as to the personalty as a disposition of whatever he should possess at the period of his decease; and this construction has prevailed in the United States, wherever the British statute of wills has been adopted, either by express enactment, or as a part of the general system of law.

Lord Mansfield once remarked, that common sense would never teach a man the difference between the *testamentary gift of a horse and a house*, and that, originally, the construction might as well have been otherwise, but that it was then too well settled to be disturbed. Indeed, experience has at length taught the British nation that it had better have been settled otherwise from the beginning, as the construction given has been found to defeat the real intention of testators, and accordingly they have remedied the evil in 1 Vic. ch. 26, by providing that testators may dispose of all the real and personal estate to which they may be entitled at the time of their death, and that every will shall be construed, with reference to the real and personal estate comprised in it, to speak and take effect as if it had been executed immediately before the death of the testator, unless a contrary intention shall appear by the will; and the result is, that the distinction in an English will between real and personal property, that was not obvious to common sense in the days of Lord Mansfield, is now abolished, and an English devise of land operates now as a will of personal pro-

perty did before the passage of the late act, and passes what-
ever real estate the testator may possess at the time of his
death, unless a contrary intent appear.   It is also to be re-
marked, that the same experience that produced the British
amendment act upon this subject, has resulted substantially in
the same enactments in the several states where the English
rule of interpretation had been introduced and prevailed.   Ac-
cordingly, in Massachusetts, at their revision in 1835, (Rev.
Stat. 417, sec. 3,) it was provided, that after acquired real
property should pass by a will, in like manner as if it were
possessed at the time of the making of the will, if such appear-
ed to be the intent of the testator ; and similar enactments have
been adopted in Maine, New Hampshire, New York, Pennsyl-
vania and other states.   (Winchester v. Foster, 3. Cush.
366.)

The Virginia statute of 1785 expressly extends the testa-
mentary power to the real property which the testator may have
at his death, and was followed in this particular in Kentucky
and Illinois ; and the result of the decisions in these states is,
that after acquired lands pass, when such appears to be the in-
tention of the testator, although in Virginia they retain the rule
adopted in England, that the words of the testator, in reference
to his real property, are to be understood as referring to the
time of the making of the will, unless a different intent appear.
(Turpin v. Turpin, 1 Wash. Virg. Rep. 75 ; Harmon v. Allen,
3 Call, 297 ; Warner's executors v. Swearingen and wife, 6
Dana, 200 ; Wells v. Watson, 4 Scam. 66.)   The legisla-
tion in our own state has been somewhat peculiar.   The first
act upon the subject, passed in 1807, was copied from the Vir-
ginia statute of 1785, and confers, in one section, upon per-
sons of full age, testamentary power over all real estate *then*
owned, or which the testator *may have at his death;* and, in
a subsequent section, confers testamentary power over the per-
sonal estate, in general terms, upon persons who are over eigh-
teen years of age.   The law so continued, without any change,
until the revision of 1835, when, under the plan of revising

then adopted, of dropping what were deemed superfluous words, the phraseology was changed to what it now is, and the testamentary power, over both real and personal property, was incorporated into one section, and conferred in the same general words ; and the same phraseology was continued in the revision of 1845, and we presume also in the last revision. The language now used, however, is not the language of the old English statute—" that any person *having* an estate may dispose of it at his pleasure," &c. ; but that every person may, " by last will, devise all his estate, real, personal and mixed," &c.

No doubt is entertained but that, under the act of 1807, after acquired real property would pass by will, whenever such appeared to be the intention of the testator. The reason why it did not pass under the English statute, was the want of testamentary power ; and that power being expressly given by our original act, the objection was out of the way ; and such seems to have been the construction given to the statute in Virginia, Kentucky and Illinois.

But the question is as to the construction of the present law. Must we hold that the act now in force does not confer testa-- mentary power over after acquired land, and, on account of the change in the phraseology of the statute, which was made in 1835, go back to the construction put upon the original statute ? We think not. The language *now used* does not require such a construction at our hands. It is different from the language of the English statute of wills. The testamentary power is given here in general language ; it embraces both real and personal estate, and is a power to make a testamentary disposition of all the testator's property, without any distinction between real and personal property, and not a mere power of particular disposition. It is more in the nature of a Roman will than an English devise of real property. But, however this may be, when we consider the plan of revising that was adopted — the impolicy of creating changes in laws of daily practical importance—the little probability, when all around us were abandoning the old, narrow construction of the testamen-

tary power, that our legislature should adopt it, for the first time, by an express provision for that purpose—and when we consider, too, that neither the community nor the profession have generally, as we believe, been aware of the supposed change—and that men have generally acted as if the original act of 1807 were still in force, and that estates have been administered and distributed accordingly,—we do not think that we would be warranted in declaring that the legislature, by the change in the language, intended to effect the substantial change in the meaning of the law that is supposed, and we shall accordingly give to the act, as it now stands, as literal a construction in favor of the testamentary power as we should have felt constrained to have given to the original act.

In this view of the subject, the question for our consideration is, what was the intention of the testator, fairly inferable from the will ? Did he intend to die testate as *to all the property he should leave*, or did he mean to embrace within his will *such land as he then owned*, together with all the personal property he might have at his death, and leave the *real property he should subsequently acquire* to go according to law ? No plain man, after reading the will, would hesitate a moment in answering this question ; but it is said that we are bound by a legal rule of construction, which constrains us to consider a will in reference to the real property, when a contrary intent does not appear on the face of it, as referring to the time it was made, although, as to personal property, it speaks from the death. We all know that this is purely an artificial rule, and that, in a majority of the cases to which it is applied, it defeats the intention of the testator. Men know that their wills are not to take effect until they die, and they make them for the purpose of fixing the distribution of their property *from that moment*, and it was under this view of the subject that in the statute of 1 Vic. ch. 26, as well as in some recent American statutes, it is declared that the will shall be considered as speaking from the moment of the death of the testator, unless a contrary intention appear. But admitting, for the purpose

of the present case, that this rule of construction, as to the time to which the will refers, is applicable to our own statute, we think there is enough in this will to show that the testator's mind was directed to the time of his death, and that the general disposition which he made of his property, had reference to that period and not to the date of the will. After disposing of a watch to one, and a lot in a burial-ground to another, the will proceeds in these words : " I hereby direct my executors to sell the *whole of my real, personal and mixed* property, on a credit of twelve months, the proceeds of which, together with what cash I may die possessed of, after all my just debts have been paid, and the sum of one hundred dollars to such of my legitimate nephews as at my death may be found named James, I wish disposed of in the following manner, viz : to be sent to my executors in Ireland," to be there invested for the use of all his brothers and sisters and their children. The testator contemplated a sale of his property immediately after his death, and in describing the property to be sold, evidently refers to all that should then belong to his estate, whether real or personal. In Brown v. Soheer, (1 Cush. 133,) where the construction of the will was under the Massachusetts act, to which we have referred, according to which, in order to pass after acquired lands, it was necessary that the intention should " clearly and manifestly appear," the court remarked : "Whenever there is a devise of the whole estate or of all the residue of the estate of a testator, there being both real and personal estate upon which the will may operate, an intention to give after acquired real property may perhaps be justly inferred, unless there be some indication of a different intention to be found in the will." In the present case, it is plain enough that the testator intended to die testate as to the whole of his property, no matter of what kind it might be. He intended it all for his brothers and sisters and their children, with the trifling exceptions that are expressed, and we should defeat and not execute his will, if we were to make a distinction, that he never thought of, and pronounce that the real property, acquired af-

ter the date of the will, was not embraced in it, but was left by him to be distributed according to law. The judgment must therefore be reversed, and the cause remanded.