## SOPHIA B. MUELLER, Appellant, v. MENA BUEN-GER.

### Division One, November 23, 1904.

1. **DEVISE: After-Acquired Land: Particular Estate: Residuum.**
   Where the devise is of a particularly described interest in certain land to a particular devisee, and there is a devise of the residuum of the testator's estate to other particularly named devisees, or to his heirs generally, an after-acquired interest in the property mentioned in the particular devise will pass under the residuary clause to the persons therein named, and will not go to the particular devisee named in the particular devise of the particular interest.

2. ———: ———: ———: ———: **This Case.** The testator gave a farm and "my interest in the tract of land owned" by himself and another, to his niece, and after making other specific bequests and devises, in the last clause gave and devised "unto my beloved wife, Mena Buenger, all the remainder of my property, both real and personal, I may possess at my death, during her natural life, excepting, however, that property which I have mentioned in the first part of this will," etc. After making the will, he acquired the undivided half of his cotenant in the tract in which by the will he had given his "interest" to his niece. *Held*, that this after-acquired half interest was not a part of the property "mentioned in the first part" of the will, and was not devised to the niece by the words "my interest" in that tract, but being a part of the "remainder" of the property of which he died possessed, it was by the residuary clause given to his wife.

Appeal from St. Louis County Circuit Court.— *Hon. John W. McElhinney*, Judge.

AFFIRMED.

*Geo. W. Lubke, Jr.*, for appellant.

A will speaks not from the time of its execution, but from the date of the testator's death. It therefore passes title to property acquired after its execution, unless, from the terms of the will itself, by fair construc-

tion, it indicates otherwise. Liggat v. Hart, 23 Mo. 127; Webb v. Archibald, 128 Mo. 299; Haley v. Gatewood, 74 Tex. 281; Strevens v. Bagley, 8 Ir. Law Rep. (N. S.) 410; Castle v. Fox, L. R. 11 Eq. 542; Russell v. Chell, 19 Ch. D. 432; 2 Woerner on Administration, p. 889; Bigelow's Jarman on Wills (6 Am. Ed.), pp. 317-327. Therefore, if between the date of the execution of a will and the date of the testator's death, the conditions of the testator's estate have changed, it must be presumed that the testator had such changes in mind when he died, and having made no changes in his will, its terms must be interpreted in the light of the conditions existing at the latter date. Vitt v. Clark, 66 Mo. App. 214.

*George W. Wolff* for respondent.

(1) A will for some purposes will speak from the date of its execution, though for certain other purposes from date of testator's death, according to the particular intent manifested in the instrument itself. Jarman on Construction of Wills, Rule 4; Schouler on Wills, (3 Ed.), sec. 486, p. 539. (2) Unless the intent clearly appear, after-acquired property will pass under the residuary clause of a will, and not under a specific devise. Liggat v. Hart, 23 Mo. 127; Applegate v. Smith, 31 Mo. 169; Hale v. Audsley, 122 Mo. 320; Webb v. Archibald, 128 Mo. 306. (3) Words not general or comprehensive in their scope will not carry after-acquired property. 2 Woerner on Administration (2 Ed.), pp. 889-890; Schouler on Wills (3 Ed.), sec. 29; Jarman on Wills, 51-326. (4) As between any repugnance or inconsistency between a specific devise and a doubtful provision in the residuary clause, the doubt will be resolved in favor of the latter—the well-established rule being that the latter of two inconsistent dispositions in a will will prevail. Jarman on Wills, Rule 7; Woerner on Administration (2 Ed.), sec. 415, p. 873. (5) The general intent gathered from a testator's will will control the particular intent. The subordinate, sec-

ondary and particular intent must, if incompatible with the primary, leading and general intent, always give way to the latter. The latter will control even against a particular clause, which, if construed separately, might conflict. Woerner on Administration (2 Ed.), sec. 416; Garth v. Garth, 139 Mo. 456; Watson v. Watson, 110 Mo. 164; Carr v. Dings, 58 Mo. 400. (6) General intent is allowed weight in determining what was intended by particular devises or bequests that may admit of an enlarged or limited construction. Schouler on Wills (3 Ed.), sec. 469, p. 522. (7) A devise in specific terms, showing that an object in existence at the date of the execution of the will was intended, excludes the operation of the present rule as to including after-acquired property. 29 Am. & Eng. Ency. Law (1 Ed.), foot notes, p. 363. (8) The words of testator Buenger, "also my interest in the tract of land owned by H. & B." are referable to the property at the time the will was written, and not to the date it took effect. Simmons v. Cabanne, 177 Mo. 354; Robards v. Brown, 167 Mo. 461.

MARSHALL, J.—This is an action under section 650, Revised Statutes 1899, to determine the interests of the parties, under the will of William Buenger, to fifty-three arpens of land in St. Louis county.

The plaintiff claims title to the whole of the land, except an undivided one twenty-fourth thereof which is vested in the heirs of Ann T. Hume, and the defendant claims that the plaintiff is only entitled to an undivided one-half of the land, and that she is entitled to a life estate in the other half thereof, with remainder to Annie Holtman, her child by her first marriage, and in the event of her death without issue, then the remainder to go to certain persons named in the will. The plaintiff is a niece of the testator and the defendant is his widow.

At the trial the plaintiff showed that at the date of the will William Buenger owned a certain farm in

St. Louis county, containing fifty arpens and known as the Franklin farm, and that at the date of the will he also owned an undivided one-half interest in the fifty-three arpens, the other half interest being at that time (less the one twenty-fourth of said other half, which was vested in the heirs of Ann T. Hume) vested in Joseph L. Hyatt. He also owned other real and personal property which is not in controversy here.

Being so possessed, said William Buenger made his will on January 29, 1889. That will was as follows:

"I, William Buenger, of the county of St. Louis, in the State of Missouri, do make and publish this my last will and testament. I am weak in body but sound in mind, and know what I am doing. After the payment of all my just debts, I give and devise unto my niece, Sophia Buenger, daughter of Henry Buenger, the farm known as the Franklin farm, situate, lying and being in the county of St. Louis, and the State of Missouri, containing fifty arpens, bounded as follows, to-wit: East by lands owned by Gustavus Wittich, south by Aubuchon and Maher, west by my own, and north by the Missouri river. Also my interest in the tract of land owned by Joseph L. Hyatt and William Buenger, containing fifty arpens, to have when she attains the age of twenty-one years, to have and to hold the same forever. But if my widow should die or marry before Sophia attained the age of twenty-one years, then she is to come into immediate possession of the above described land.

"I give and bequeath unto my two brothers and two sisters, Henry Buenger, Casper H. Buenger, Riker Klostermeyer and Louisa Branderler, or their heirs, two thousand dollars, to be divided equally between them share and share alike, but my brother Henry is now dead, and I wish that the five hundred dollars that was for him to go to his three sons, William, Henry and Harmon Buenger, share and share alike, to be paid with-

in, two years after this will is probated; I except Harmon Buenger's share; I wish his share of the five hundred dollars to remain in my estate until he is of age and to bear six per cent per annum until paid. Interest commencing two years after this will is probated.

"I also give and bequeath unto Charles Meyer, my nephew, the following parcels of land, now belonging to me in the Monroe tract: Nos. seven and eight, containing fifty-five acres more or less, to have and to hold forever, provided, that he pays William Buenger and Conrad Buenger (sons of Casper H. Buenger) each one hundred dollars, and one hundred dollars to William Klostermeyer, also fifty dollars each to William and Henry Buenger, sons of Henry Buenger. This must be paid within two years after this will is probated.

"I give and devise unto my beloved wife, Mena Buenger, all of the remainder of my property, both real and personal, I may possess at my death during her natural life, excepting, however, that property which I have mentioned in the first part of this will, and if my wife should marry then I give and devise unto Annie Holtman, daughter of my wife by her first husband, the following parcels of land, Nos. twenty-three, twenty-four, and twenty-five, and if my wife die before Annie Holtman then Annie Holtman shall have the whole of this property, and if Annie Holtman should die without living children of her body, then this estate, except as already provided, shall be divided equally between the following named persons or their heirs (and Annie's husband if she has any): My brother Henry and Casper H. Buenger, Riker Klostermeyer, Louisa Branderler, Theodore Wolff, Annie Kamper (the wife of August Kamper) and the heirs of Fritz Wolff (the heirs shall inherit only the parent's part).

"I hereby appoint my wife, Mena Buenger (without being required to give security), my sole executrix of this my last will and testament, hereby revoking all former wills by me made.

"In witness hereof, I have hereunto set my hand this twenty-ninth day of January, A. D., 1889."

The plaintiff also showed that after the execution of his will, William Buenger, to-wit, on April 25, 1895, acquired the other half of the fifty-three arpens (less the one twenty-fourth thereof aforesaid) that had been owned by Joseph L. Hyatt.

This was all the evidence offered by the plaintiff, and was all the evidence adduced in the case, for the court excluded the evidence offered to be introduced by the defendant "tending to prove the circumstances, surroundings, situation, and family relations of William Buenger, the objects of his bounty, and extent and value of his estate; and also the statements of the testator made before and after the execution of the will, as to his intentions."

The court then rendered judgment in favor of the defendant, and adjudged the plaintiff to be entitled to an undivided one-half interest in the fifty-three arpens, and the defendant entitled to a life estate in the other part acquired from Hyatt, and her daughter and the persons named in the residuary clause of the will, entitled to the remainder in that part. From that judgment the plaintiff appealed.

## I.

The only question presented by this record is, whether the plaintiff is entitled to the whole of the fifty-three arpens (less the one twenty-fourth aforesaid) or whether she is entitled to only an undivided one-half of the whole.

The law upon this subject has been so thoroughly and ably discussed in the prior adjudications in this State that a review of these cases will easily solve the case at bar.

One of the best considered, learned and satisfactory discussions of the subject is contained in the opinion of LEONARD, J., in Liggat v. Hart, 23 Mo. 127, and because

of its force and clearness, the following extensive excerpt therefrom is both justified and appropriate.

The learned judge said:

"Mr. Butler, in a very able note to Coke's first Institutes (191, a), after specifically pointing out the difference between the Roman and the feudal law, upon the subject of succession to the estates of deceased persons, thus forcibly sums up the contrast: 'By the Roman law, the heir was a person appointed indiscriminately by the law or the deceased to represent him, and, in consequence of that representation, was entitled to his property, and bound by his obligations. In the feudal law, the heir was a person of the blood of the ancestor, appointed by the original contract to the succession, and, in consequence of that succession, was supposed, more by the general notions of mankind than by the notions of the feudal polity, to represent the ancestor. By the Roman law, the heir succeeded to the property of the ancestor in consequence of his civil representation of him, and supposed continuation of his personal estate. In the feudal law, he acquired a national representation to the ancestor, in consequence of the feudal succession. In the Roman law, real and personal property was equally the subject of inheritance. In the feudal law, inheritance was confined to real property. The Roman heir claims as such all from the person last possessed, and nothing from the original donor. The feudal heir claims as such all from the donor, and nothing from the person last possessed.' The power of an owner to appoint a successor to his property, both real and personal, after his death, which seems to be nothing more than one of the natural rights of property, prevailed to its full extent among the Saxons of England. When, however, upon the establishment of the Normans, the feudal system became a part of the law of England, so that tenants in fee could not alien without the consent of the lord, the power of disposing by will, as well as every other mode of aliening land, generally ceased.

And, although the feudal restraint upon alienation could not but gradually yield, as an unnatural limitation upon property, and accordingly many of the restraints were removed before Glanville wrote, yet the power of disposing by will was not allowed for a long time afterwards, partly from the fear lest persons should be imposed upon in their last extremity, and partly from the want of that notoriety which the common law required in all transfers of real property. During the suspension of the direct power, which continued from Henry II. to the latter end of Henry VIII., it was indirectly but substantially acquired, and exercised by means of uses. This indirect practice, however, of devising lands, was at length checked by the statute of the 27th Henry VIII., which, transferring the legal estate to the use, extinguished, for a time, the separate equitable ownership, and with it the incidental power of devising. The consequence was, that lands again became generally unalienable, except by a conveyance, to take effect in the lifetime of the proprietor; but the legislature found it necessary, within a few years afterwards, to allow of testamentary dispositions of land, and for that purpose the statute of wills was passed, in 31 Henry VIII., and amended in the 34 of the same king (1 Powell on Devises, ch. 1; Cruise on Real Property tit. 38, ch. 1).

"While the power of disposing of lands by will was exercised by means of uses, the will being considered the mere appointment of a use, it was holden that it could only operate on lands of which the party was possessed at the time, and could not affect any lands subsequently acquired; and the courts accordingly adopted the same narrow principle when they came to put a construction on the statute of wills; and, therefore, although the idea of a real devise was, as Lord Mansfield remarked (Cowper, 303), derived from a Roman will, which was the appointment of an heir to succeed to the property and to discharge the obligations of the ances-

tor, including his testamentary donations, yet it was treated in the English law not like an English will of personal property, when the executor corresponds with the instituted heir of the Roman law, but as a particular conveyance of the lands embraced in it, and was subjected, in the particular now under consideration, to the rules applicable to such conveyances, instead of being treated as a testamentary disposition to take effect after the death of the disposer. It accordingly became a settled rule in the construction of the English statute of wills, that, if a testator devised all the real estate of which he should be seized at the time of his death, and after the making of the will he purchased lands in fee, *such after-acquired property,* whether it was conveyed to the testator or to a trustee for him, *did not pass by the will, but descended,* as to the legal inheritance in the former case, and as to the equitable in the latter, to the testator's heirs at law (1 Jarman on Wills, 85; Bunter v. Coke, 1 Salk. 237; s. c., 3 Bro. P. Cases 19); and the reason of this was, not on account of the intent on the part of the testator, but because he had no legal power to dispose by will of land which *he did not own at the time;* and the reason given for this construction was not merely that a limited testamentary power was conferred by the very words of the act, but because such was the legal consequence, in the absence of any express provision to the contrary, of considering a devise, not in the nature of a will, but of a particular conveyance. Under the old law, therefore, when a testator made a general gift of his real and personal estate, he was considered as meaning to dispose of these respective portions of property to the full extent of his testamentary power, and it accordingly *took effect as a gift of* such real estate as belonged to him at the time of the execution of the will, and as to the personalty as a disposition of whatever he should possess at the period of his decease; *and this construction has prevailed in the United States, wherever the British statute of wills*

*has been adopted,* either by express enactment, or as a part of the general system of law.

"Lord Mansfield once remarked, that common sense would never teach a man the difference between the *testamentary gift of a horse and a house,* and that, originally, the construction might as well have been otherwise, but that it was then too well settled to be disturbed. Indeed, experience has at length taught the British nation that it had better have been settled otherwise from the beginning, as the construction given has been found to defeat the real intention of testators, and accordingly they have remedied the evil in 1 Vic. ch. 26, by providing that testators may dispose of all the real and personal estate to which they may be entitled at the time of their death, and that every will shall be construed, with reference to the real and personal estate comprised in it, to speak and take effect as if it had been executed immediately before the death of the testator, unless a contrary intention shall appear by the will; and the result is, that the distinction in an English will between real and personal property, that was not obvious to common sense in the days of Lord Mansfield, is now abolished, and an English devise of land operates now as a will of personal property did before the passage of the late act, and passes whatever real estate the testator may possess at the time of his death, unless a contrary intent appear. It is also to be remarked, that the same experience that produced the British amendment act upon this subject, has resulted substantially in the same enactments in the several States where the English rule of interpretation had been introduced and prevailed. Accordingly, in Massachusetts, at their revision in 1835 (Rev. Stat. 417, sec. 3,) it was provided, that after-acquired real property should pass by a will, in like manner as if it were possessed at the time of the making of the will, if such appeared to be the intent of the testator; and similar enactments have been adopted in Maine, New Hampshire, New York, Pennsylvania

and other States. (Winchester v. Forster, 3 Cush. 366.)

"The Virginia statute of 1785 expressly extends the testamentary power to the real property which the testator may have at his death, and was followed in this particular in Kentucky and Illinois; and the result of the decisions in these States is, that after-acquired lands pass, when such appears to be the intention of the testator, although in Virginia they retain the rule adopted in England, that the words of the testator, in reference to his real property, are to be understood as referring to the time of the making of the will, unless a different intent appear. (Turpin v. Turpin, 1 Wash. Virg. Rep. 75; Allen v. Harrison, 3 Call 297; Warner's Executors v. Swearingen and Wife, 6 Dana 200; Willis v. Watson, 5 Scam. 64.) The legislation in our own State has been somewhat peculiar. The first act upon the subject, passed in 1807, was copied from the Virginia statute of 1785, and confers, in one section, upon persons of full age, testamentary power over all real estate, *then* owned, or which the testator *may have at his death;* and in a subsequent section, confers testamentary power over the personal estate, in general terms, upon persons who are over eighteen years of age. The law so continued without any change, until the revision of 1835, when, under the plan of revising then adopted, of dropping what were deemed superfluous words, the phraseology was changed to what it now is, and the testamentary power, over both real and personal property, was incorporated into one section, and conferred in the same general words; and the same phraseology was continued in the revision of 1845, and we presume also in the last revision. The language now used, however, is not the language of the old English statute, 'that any person *having* an estate may dispose of it at his pleasure,' etc.; but that every person may, 'by last will, devise all his estate, real, personal and mixed,' etc.

"No doubt is entertained but that, under the act

of 1807, after-acquired real property would pass by will, whenever such appeared to be the intention of the testator.   The reason why it did not pass under the English statute, was the want of testamentary power; and that power being expressly given by our original act, the objection was out of the way; and such seems to have been the construction given to the statute in Virginia, Kentucky and Illinois.

"But the question is as to the construction of the present law.   Must we hold that the act now in force does not confer testamentary power over after-acquired land, and, on account of the change in the phraseology of the statute, which was made in 1835, go back to the construction put upon the original statute? we think not.   The language *now used* does not require such a construction at our hands.   It is different from the language of the English statute of wills.   The testamentary power is given here in general language; it embraces both real and personal estate, and is a power to make a testamentary disposition of all the testator's property, without any distinction between real and personal property, and not a mere power of particular disposition.   It is more in the nature of a Roman will than an English devise of real property.   But, however this may be, when we consider the plan of revising that was adopted—the impolicy of creating changes in laws of daily practical importance—the little probability, when all around us were abandoning the old, narrow construction of the testamentary power, that our Legislature should adopt it, for the first time, by an express provision for that purpose—and when we consider too, that neither the community nor the profession have generally, as we believe, been aware of the supposed change—and that men have generally acted as if the original act of 1807 were still in force, and that estates have been administered and distributed accordingly—we do not think that we would be warranted in declaring that the Legislature, by the change in the language,

intended to affect the substantial change in the meaning of the law that is supposed, and we shall accordingly give to the act, as it now stands, as literal a construction in favor of the testamentary power as we should have felt constrained to have given to the original act.''

The learned judge then applied the principles of law so declared to the facts in judgment, and pointed out that after a specific devise of a watch to one and a burial lot to another, the will in that case provided: ''I hereby direct my executors to sell the *whole of my real, personal and mixed property,*'' and, after the payment of his debts and the sum of one hundred dollars to such of his nephews as should be named James, he directed the proceeds of such sale ''to be sent to my executors in Ireland'' to be there invested for the use of his brothers and sisters. And it was held the will applied as well to property acquired after the will was made as to the property owned by the testator at the date of the will. And there can be no two minds as to the correctness of the conclusion there reached, for the devise was practically of the whole estate to the same beneficiaries. As applied to the case at bar that opinion is not only valuable for its historical data, but also for the rules of law laid down. This is especially true as to the evolution of the statute of wills in this State from 1807 to 1856 when the opinion was written.

The statute of wills of 1845 (R. S. 1845, ch. 185, sec. 1.) and of 1855 (R. S. 1855, ch. 167, sec. 1) provided: ''Every person of twenty-one years of age, and upwards, of sound mind, may, by last will, devise all his estate, real, personal, and mixed, and all interest therein, saving to the widow her dower.'' And section 2 of the revisions of 1845 and 1855, relating to wills, provided: ''Every person over the age of eighteen years, of sound mind, may, by last will, dispose of his goods and chattels.''

There is no substantial difference, so far as con-

cerns this case, between that statute and the act of 1879, which was in force when this will was made on January 29, 1889. The act of 1879 (R. S. 1879, ch. 71, sec. 1), provided: "Every male person, twenty-one years of age and upwards, of sound mind, may, by last will, devise all his estate, real, personal, and mixed, and all interest therein, saving the widow her dower. And every male person over the age of eighteen years, and of sound mind, may, by last will, bequeath all his personal estate, saving the widow her dower."

It is unnecessary here to refer to the power given to married women to make wills.

There is, therefore, no material difference, so far as concerns this case, between the statutes that were in force when Liggat v. Hart supra, was decided, and the statutes as they are today.

Liggat v. Hart, supra, was cited and followed in Applegate v. Smith, 31 Mo. 166. In that case the testator lived in Kentucky and made his will there. He devised to his wife "his whole estate, real, personal, and mixed, wherever situated." He afterwards purchased land in Missouri, and the only question was whether the after-acquired land passed to the devisee. In that case the devise was of the whole estate, and Scott, J., said: "The only material point in this case is whether the after-acquired lands passed by the devise to Martha Applegate. The will was made in Kentucky, and by the law of that State there must be something in the will itself which showed that the after-acquired lands were intended to be passed by it in order that it may have that effect. A general devise of all his property, or of all his estate, or a general disposition of his land, will not authorize such a deduction. But his intention to devise whatever interests he may own in land at his death must be disclosed by the language used, or by the actual import of the provisions contained in the will." It was pointed out, however, that as the land lay in Missouri, the laws of this State would govern, and that un-

der the laws of this State a non-resident owner of lands in this State was allowed to make a will of such land, and it was held that the law as to after-acquired land was correctly laid down in Liggat v. Hart, supra.

Here again it will be observed the devise of the whole estate was to the same beneficiary, and the only question therefore was whether the will covered the after-acquired property or whether as to that the testator died intestate.

The question here involved next came before this court in Hale v. Audsley, 122 Mo. 316. That case turned upon the construction of the will of Charles Sterne. The second paragraph of that will gave his wife a life estate in his home place, with a remainder in fee to his granddaughter and her heirs. The third paragraph of that will gave his granddaughter and her heirs another tract of about seven hundred acres, and added: "And I further will and devise to my said grandchild and the heirs of her body, any and all other real estate, I may now have or hereafter may acquire, wherever situated," etc. The fifth paragraph of that will also gave to his granddaughter "an undivided interest of one-third of what is called the Latham farm," containing three hundred and twenty acres. The sixth paragraph of that will provided that if his granddaughter died without issue or heirs of her body, the "real estate hereinbefore mentioned and described" should go to the testator's nephews and nieces in equal parts, but if his said grandchild left heirs of her body surviving her the land should go to them in fee.

That case involved the right of said granddaughter to convey an one-sixth interest in the Latham farm. At the date of the will, the testator and one Hale, owned each an undivided half of the two-thirds interest in the farm, and one Branch owned the other one-third. After the execution of the will, the testator and Hale purchased Branch's one-third interest, and held it in undi-

vided shares of one-sixth each at the time of the testator's death.

BLACK, J., speaking for this court, said:

"The question is, whether the one-sixth interest acquired by Sterne (the testator) after the date of the will passed to the plaintiff (the granddaughter) Lelia and the heirs of her body by force of the residuary clause in the third paragraph of the will or to her absolutely under the fifth paragraph. Real property acquired after the date of a will will pass to the devisee, where it appears from the will that the testator intended to thereby dispose of such after-acquired property, and it will pass according to the intention of the testator the same as in case of property owned by the testator at the date of the will. [Liggat v. Hart, 23 Mo. 127; Applegate v. Smith, 31 Mo. 166.] This will appears to have been prepared with care, and it seems to us its meaning is clear and not open to two constructions, and that the undivided one-sixth passed to Lelia by virtue of the residuary clause in the third paragraph. The fact that this clause is found in the third paragraph and not in the fifth or some subsequent part of the will is wholly immaterial. This residuary clause in the most express terms disposes of any after-acquired real estate, and it also disposes of all real estate owned by the testator at the date of the will, not thereby specifically devised. The question, then, is whether the language of the fifth paragraph can be expanded so as to include this one-sixth.

"At the date of the will the testator owned a one-third interest in the Latham farm. It is this interest he is speaking of when he says he devises to Lelia 'an undivided interest of one-third in what is commonly called the " Latham Farm;" ' and in the same paragraph he again speaks of this interest as 'my said interest of one-third in said Latham farm.' It is perfectly

manifest that the testator in making this devise had in mind only the interest which he then owned, and it was this interest of one-third, and this only, that he undertook to dispose of by this paragraph. To say the testator intended to give this after-acquired interest of one-sixth to Lelia upon the terms named in the fifth paragraph is to make a codicil for him when he did not see fit to make one himself. This we cannot do. We have no power to deal with testaments in any such way. It is true we must construe the will from a consideration of all its parts and in the light of the surrounding circumstances under which it was written, but we cannot change the plain, clear and emphatic language of the testator. The fifth paragraph disposes of a one-third interest and no more. The trial court held that the after-acquired one-sixth passed by the fifth paragraph, and in this it erred. The judgment is reversed and the cause remanded to be tried on the construction of the will here pointed out.''

The difference in that case was that under the residuary clause contained in the third paragraph of the will the devise was to the granddaughter and her heirs, whereas, under the fifth paragraph, the devise was to the granddaughter absolutely. The trial court held that the granddaughter took the after-acquired one-sixth interest in the Latham farm, under the fifth clause of the will, and this court held that to be error, and that the granddaughter took such after-acquired interest under the third clause of the will.

The gravamen of that case is in the following words: ''Real property acquired after the date of a will will pass to a devisee, where it appears from the will that the testator intended to thereby dispose of such after-acquired property, and it will pass according to the intention of the testator at the date of the will. [Liggat v. Hart, 23 Mo. 127; Applegate v. Smith, 31 Mo. 166.]''

And in that case the intention of the testator as to

the Latham farm was ascertained from the fifth paragraph of the will to be that he only intended to give her absolutely the undivided one-third interest therein that he owned at the date of the will, and therefore the after-acquired one-sixth interest in said farm passed to her and the heirs of her body under the residuary clause of the will.

That decision as applied to the facts in judgment here would result in holding that the testator intended to devise to his niece, the plaintiff herein, by the first paragraph of the will his undivided one-half of the fifty-three arpens that were owned by him at the date of the will, and that as the other undivided one-half interest therein was then owned by Hyatt, the testator did not intend to devise that. But that as the testator acquired Hyatt's undivided interest in said fifty-three arpens after the date of the execution of the will, he intended that it should pass under the residuary clause of the will to his wife for life, with remainder in fee to the persons named in the residuary clause.

The question was again before this court in Webb v. Archibald, 128 Mo. 299. That case turned upon a construction of the will of Mrs. Margaret Lindsay. By the first clause of her will the testatrix bequeathed to her daughter, the plaintiff, Kate Webb, thirty-seven hundred and fifty dollars to be invested in land for her sole use. By the second clause of the will the testatrix bequeathed four hundred and twenty acres of land, which was therein described to be "all of my real estate," to her three children, Thomas Archibald, William Archibald and Margaret Winkler, and to her grandson, Harry Archibald, and their heirs and assigns, each to have one-fourth of said real estate. By the third clause of her will the testatrix bequeathed to her son, William Archibald, one thousand dollars, for the purpose of making him even with her other children. This will then concluded as follows: "Out of the balance of my property I desire my debts to be paid, and should

there be anything left, I desire it to be equally divided between Thomas Archibald, William Archibald and Margaret Winkler; above named are all of my children, as I have never had any children by my present beloved husband, Clark Lindsay.''

Between the date of her will and the date of her death, the testatrix acquired another tract of land of one hundred and twenty acres, and also several thousand dollars worth of personal property.

The plaintiff claimed one-fourth of such after-acquired real and personal property by descent, upon the theory that as to such after-acquired property Mrs. Lindsay died intestate. The trial court took this view and rendered judgment accordingly. This court reversed the judgment and held that the after-acquired property passed, under the residuary clause of the will, to Thomas Archibald, William Archibald and Margaret Winkler, the other children of the testatrix, and that it was the intention of the testatrix that as the plaintiff had been fully provided for by the first clause of the will, and as she was not named as one of the residuary legatees in the will, she was not entitled to any part of the after-acquired property.

BRACE, J., speaking for the court, solved the legal questions involved in such clear and convincing terms that they throw a flood of light upon the case at bar. He said:

''In the leading case of Liggat v. Hart, 23 Mo. 127, LEONARD, J., said: 'Men know that their wills are not to take effect until they die, and they make them for the purpose of fixing the distribution of their property *from that moment.*' Since that decision, construing the first section of our statute of wills, there never has been any question in this State but that the language of a will is to be construed as of the date of the decease of the testator, unless the contrary appears to have been his intention, and that the will operates upon all the estate of the testator, real and personal, at the time of

his decease, so far as its terms are applicable, unless the intention of the testator appears to be otherwise. [1 Redfield on Wills (3 Ed.), chap. 9, sec. 1.]

"The language of the will in question leaves no room for doubt that the testatrix in the disposing clauses of her will was fixing the distribution of her property 'from the moment of her death.' The first item of her will, containing the legacy to the plaintiff, discloses this as her thought in the expression 'on my death,' which runs through the dispositions of the will. Nor does that language leave any room for doubt that the testatrix intended to dispose of all the property of which she was possessed at the moment of death, for, after making all the specific bequests she desired, she closed the third and last item with a residuary clause disposing of 'anything left,' 'out of the balance of my property.'

"There is nothing in the language of the will, nor rules of law given for its interpretation, upon which the idea of an intestacy as to any of the testatrix's property can be predicated. There is no room in the case for the indulgence of any presumptions on account of a *disherison*. There is no *disherison* in the case. The testatrix carefully named all those who by nature had immediate claims on her bounty, and as carefully provided for them. That the provision made by her may have been unequal as between them can furnish no basis for a presumption that she intended an intestate as to any of her property; yet, in order to sustain the trial court in its ruling, we should not only have to indulge in some such presumption, but permit it to override, not only the foregoing well-settled principles of law for the construction of the testatrix's will, but her unequivocally expressed intention as to the share the plaintiff should have in her estate; for nothing can be clearer than that it was the intention of the testatrix, not only that the plaintiff should have no interest in the testatrix's landed estate, but that her husband should have no interest in

such estate, or in any lands that might come to her by means of the legacy left in the will. In both respects the intention of the testatrix would be defeated by the ruling of the trial court that she died intestate as to the 'Winfrey Farm.'

"This brings us to the only remaining question, to whom did that farm pass by the will? It passed either by the second item or the residuary clause of the third item of the will. Reading these items together it is impossible to escape the conclusion that the intention of the testatrix was to make a difference between her three children and her grandchild named therein—that there was a part of her estate in which she wished that they should all share equally, and there was a part of her estate in which she wished that only her said three children should share equally and in which her grandchild should have no share. The estate in which the four should share equally was devised by the second item. It was a landed estate. The disposing part of that item is 'all my real estate.' This expression, if there had been nothing more, would have been sufficient to pass all her real estate, including any that she might have acquired after the execution of the will. She did not stop there, however, but immediately, in the same item and connection, proceeded to define those terms, by giving her meaning thereof to be the 'farm on which I now live' and the timber land south of it. It is not material that she may not have given correctly the number of acres therein. There is no difficulty in identifying the land devised, and it was in these particular lands that the four were to share equally at her death. For purposes of description she referred to an existing state of things, thus giving an illustration of the exception to the general rule, hereinbefore stated, that the language of the will is to be interpreted as having been used with reference to the time of the death of the testator, the exception being in the language of ELLSWORTH, J., in Gold v. Judson, 21 Conn. 616, that 'wherever a testator

refers to an actually existing state of things, his language should be held as referring to the date of the will, and not to his death, as this is then a prospective event. Such, it is clear, is the construction of the word *now*.'

"The estate in which her three children, Thomas Archibald, William Archibald and Margaret Winkler, were to share equally, but in which the grandchild, Harry Archibald, was to have no part, was devised in the residuary clause of the third item of the will, and it was to be anything left of her property after her debts were paid, not included in the specific bequests—anything left, whether of real or personal property."

The rules that result from these cases, therefore, may be briefly stated to be as follows: First, the intention of the testator is the controlling guide, and that intention must be gathered from the four corners of the will, in the light of the circumstances under which it was written. Second, if the devise is of the whole estate of the testator to the same beneficiary, it will pass after-acquired property as well as all that he owned when the will was made. Third, if the devise is of a particularly described interest in certain land to a particular devisee, and if there is a devise of the residuum of his estate to other particularly named devisees, or to his heirs generally, then any after-acquired interest in the property mentioned in the particular devise, will pass under the residuary clause to the persons therein named, and will not go to the particular devisee named in the particular devise of the particular interest.

It only remains to apply these rules to the case at bar. The testator first provided for the payment of his debts. Then he made provision for his niece, the plaintiff herein, by giving her the Franklin farm of fifty arpens, and also gave her "my interest" (which at that time was an undivided one-half) "in the tract of land owned by Joseph L. Hyatt and William Buenger" (the testator), which contained fifty-three arpens. He then gave his two brothers and sisters, or their heirs, two

thousand dollars in equal parts.   He next gave his nephew fifty-five acres of land, on condition that he paid certain specified sums, within a specified time, to certain persons named.   And having thus specifically provided for his other relatives and family, his mind turned to his wife, and her daughter by her first marriage, and by the residuary clause of his will he devised "unto my beloved wife, Mena Buenger, all of the remainder of my property, both real and personal, I may possess at my death, during her natural life, excepting, however, that property which I have mentioned in the first part of this will."   He then provided that if his wife should marry, he devised certain of said residuum to his stepdaughter, and if his wife died before his stepdaughter, the latter should have "the whole of this property," and if his stepdaughter died without issue, "then this estate except as already provided shall be equally divided" among his brothers and sisters.

Thus the intention of the testator clearly appears to be to give the plaintiff the whole of the Franklin farm and the half of the fifty-three arpens he then owned and of which Hyatt owned the other half, and to give his wife "all the remainder of my property, both real and personal, I may possess at my death, during her natural life, excepting that property mentioned in the first part of this will," and the remainder to go as above explained.   This is the only provision he made in his will for his "beloved wife."

Thus it appears that the devise to the plaintiff was of a particular interest in particular land, whereas the devise to his wife covered all his property, real and personal, except what he had particularly given to plaintiff and the fifty-five acres particularly given to his nephew. Not only this, but the devise to the plaintiff was of the particular interest in the tract of land "owned by Joseph L. Hyatt and William Buenger."   While the devise to his wife was of "all the remainder of my prop-

erty, both real and personal I may possess at my death.'' The devise to the plaintiff, therefore, related to and covered only a particular interest in a particular tract of land, owned by him at the date of the will. Whereas the devise to the wife covered not only the residue of all real and personal property that he owned at the date of the will, but also the residue of all, ''I may possess at my death,'' thereby intending to give to his wife any property he might acquire between the date of the execution of the will and the date of his death.

The circuit court, therefore, properly held that the after-acquired interest in this case passed under the residuary clause of the will to the persons therein named, and not to the plaintiff under the first clause of the will, and the judgment must be affirmed.

All concur, except *Robinson, J.,* absent.